Filed 3/20/26  Angela H. v. Superior Court CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ANGELA H., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF LOS ANGELES COUNTY, <br><br> Respondent; <br><br><br> LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Real Party in Interest. | B349291 <br><br> (Los Angeles County Super. Ct. No. 23LJJP00418) |

ORIGINAL PROCEEDING; petition for extraordinary writ.  Jennifer W. Baronoff, Juvenile Court Referee.  Petition granted.

Law Office of Emily Berger and Michael Hefty for Petitioner.

No appearance for Respondent.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica Buckelew, Deputy County Counsel, for Real Party in Interest.

———————————————

In December 2023 Ace H. was detained from his mother, Angela H. (Mother), and father, Benjamin R. (Father), after Ace and Mother tested positive for marijuana at the time of Ace's birth. The juvenile court sustained a petition under Welfare and Institutions Code section 300, subdivision (b)(1),[1] and removed Ace from his parents' care. For the first 11 months after Ace's removal, Mother failed to enroll in services as required by her case plan and repeatedly tested positive for marijuana. In November 2024 Mother began testing negative for all substances, and by early 2025 she was enrolled in all court-ordered programs. However, after approximately eight months of making substantial progress on her case plan, Mother experienced a setback in the summer of 2025 when she was dropped by her therapist and her domestic violence program. Mother also missed two drug tests during this time.

By the time of the 18-month review hearing (§ 366.22) in September 2025, Mother had re-enrolled in counseling and domestic violence classes and continued to test negative. Nevertheless, the juvenile court terminated Mother's

---

[1]     Further statutory references are to the Welfare and Institutions Code.

reunification services, finding a substantial risk of detriment to Ace's safety if he were returned to Mother's care. The court set a hearing pursuant to section 366.26 to terminate Mother's parental rights and consider a plan for adoption.

Mother seeks extraordinary writ relief, arguing substantial evidence does not support the juvenile court's finding that returning Ace to her custody would create a substantial risk of detriment to his safety. We agree and grant the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Dependency Petition and Ace's Removal from Mother and Father*

In November 2023 the Los Angeles County Department of Children and Family Services (Department) received a referral for newborn Ace alleging general neglect after Mother tested positive for marijuana at Ace's birth. Ace's drug test also came back positive for marijuana. Mother told a Department social worker that she had started using drugs when she was 13 years old (approximately seven years earlier) and was hospitalized on a psychiatric hold around that time with diagnoses of major depressive disorder, post-traumatic stress disorder, bipolar depression, and anxiety. Mother said she had last used marijuana in early October 2023. She used marijuana "randomly" when she had difficulty sleeping or eating, but she had used marijuana only two or three times toward the end of her pregnancy. She was not currently using marijuana because she was breastfeeding. However, she intended to use marijuana again when she stopped breastfeeding in a few months.

3

During its investigation, the Department learned of a domestic violence incident between Mother and Father that occurred in October 2022. Mother had taken Xanax and "blacked out." Father tried to wake Mother, and she became agitated and kicked Father in the head. The paternal grandmother entered the room to see what was happening, and Mother slapped her. Mother was arrested and charged with misdemeanor spousal battery (Pen. Code, § 243, subd. (e)(1)) and misdemeanor battery (*id*., § 242). The juvenile court ordered Mother into a diversion program as a part of which she participated in individual therapy, meetings with a "life specialist," and parenting classes. She was also required to complete a 52-week domestic violence program and drug treatment program. The criminal court entered a protective order directing Mother to stay away from Father and paternal grandmother. Mother told the Department social worker that she and Father had attempted to have the stay-away order terminated or modified, but they were told it could not be changed until Mother completed her court-ordered services. Mother understood that living with Father was in violation of the stay-away order, and she intended to move out in January 2024.

On December 15, 2023 the juvenile court granted a removal order to detain Ace from his parents, and on December 19 the Department filed a petition on behalf of Ace pursuant to section 300, subdivisions (a) and (b)(1). The petition alleged Mother and Father had a history of violent altercations, including the October 2022 incident when Mother kicked Father in the head. The petition also alleged Mother had a "history of substance abuse[,] including cocaine, methamphetamine, psychedelic drugs and Xanax" and was "a current abuser of

marijuana," which rendered Mother incapable of providing regular care and supervision for Ace. A separate allegation stated Ace's positive toxicology screen at birth showed Mother had placed Ace at risk of serious physical harm. The petition also alleged Father had a history of substance abuse, including fentanyl, and was a current abuser of marijuana, and Mother knew of Father's substance abuse and failed to protect Ace.

At the March 4, 2024 jurisdiction and disposition hearing, the juvenile court dismissed the allegation pursuant to section 300, subdivision (a), and sustained the remaining allegations pursuant to subdivision (b)(1) regarding Mother and Father's drug use, Ace's positive toxicology result, and the parents' history of violent altercations. Ace was removed from his parents' custody and placed in a foster home. The court ordered family reunification services and required Mother to participate in anger management classes, parenting classes, and individual counseling and to submit to weekly random and on-demand drug and alcohol testing. The court ordered monitored visitation for Mother three times per week for three hours each visit, with the Department having discretion to liberalize visitation.

B.    *The Reunification Period*

During the initial six-month reunification period, Mother struggled to comply with her case plan. Between March 1 and August 5, 2024 she tested positive for marijuana seven times and failed to show for the remaining 16 tests. As of mid-August 2024 Mother had enrolled in parenting classes but had not yet started attending. She had not enrolled in anger management classes. While not ordered by her case plan, in 2024 Mother attended

5

seven Narcotics Anonymous meetings and one Alcoholics Anonymous meeting. Mother regularly attended weekly individual counseling sessions during 2024 except for a period of five missed sessions in July. Mother was scheduled for monitored visits with Ace twice a week for two hours each visit, but she cancelled or failed to show up for 23 visits between March and August 2024. During the visits she attended, Mother was observed to be "extremely attentive" and "very affectionate" with Ace. No concerning behaviors were observed during the visits.

At the six-month review hearing on September 4, 2024, the juvenile court found Mother's progress on her case plan was unsubstantial and ordered continuation of her reunification services.[2]

In the first few weeks after the review hearing, Mother continued to test positive for marijuana. Between September 4 and November 18, 2024 Mother missed two tests and tested positive 11 times. Her highest level of marijuana was on October 15 (848 ng/mL), after which the level declined until she tested negative on November 26. During the period from November 26, 2024 to March 25, 2025 Mother tested negative 17 times and missed two tests.

Mother's elevated levels of marijuana coincided with an incident during an October 10, 2024 visit in which Mother had difficulty changing Ace's diaper and appeared drowsy. Mother agreed to an on-demand drug test, which was positive for marijuana. Other than the October 10 incident, the Department never observed concerning behavior during Mother's visits.

---

[2] Father's reunification services were terminated at the six-month review hearing.

Mother attended visits consistently and made "extremely strong efforts . . . to further strengthen the bond between her and her child."

By April 2025 Mother had completed 22 parenting classes and seven anger management classes. The provider of the anger management classes reported Mother "actively participates in discussions showing a willingness to understand the material and the implications of her behavior." Mother's individual therapist reported Mother was "attending sessions regularly and making significant progress." The therapist further noted in March 2025 that Mother had "several environmental stressors" and "she has implemented her new skills and regulated and stabilized herself where before [that] might not have been attainable."

At the 12-month review hearing on April 9, 2025, the juvenile court found Mother's progress on her case plan was substantial and ordered continuation of reunification services. The court also liberalized Mother's visitation to be unmonitored but in the Department's offices.

In April 2025 a Department social worker conducted an assessment of Mother's home, where Mother lived with a roommate and the roommate's children. The social worker did not observe any drug paraphernalia or other hazardous items. Mother moved to her own home in July 2025, and the social worker "congratulated mother on this milestone she accomplished."

Sometime after Mother ended her relationship with Father in February 2025, Mother began a relationship with a man who was incarcerated "due to an altercation that . . . resulted in him stabbing another male, leading to the man's death." The

Department social worker spoke to the boyfriend on the telephone, and he indicated he would be eligible for parole in September 2026. The social worker expressed concern over the relationship, and in July 2025 Mother informed the social worker that she had ended the relationship because "she understands the detriments that this relationship has caused for her in relation to meeting her goal of reunification."

In the first three months following the 12-month review hearing, Mother continued to comply with her case plan. By June 2025 she had completed 29 parenting classes. On June 2 Mother's anger management provider reported Mother had completed 17 batterer's intervention classes and "has demonstrated a commendable level of accountability throughout her engagement in group sessions. She actively participates in all group discussions and contributes meaningful insights, showcasing her commitment to personal growth and the objectives of the anger management program." However, Mother was released from the program effective August 1 due to "non-attendance and lack of communication." Mother told the Department that she was released because she "did not get along with the group leader." Mother was able to re-enroll in the program on September 15.

On July 8, 2025 Mother's therapist reported that Mother was attending sessions regularly and was making significant progress toward her treatment goals. Despite these statements, on August 12 the therapist sent a letter to the social worker stating Mother was no longer her client. The therapist explained Mother "had several attempts with attendance contracts and warning letters over the year due to lack of attendance and will

kind of drop off and not contact me for weeks at a time." Mother found a new therapist and resumed sessions on September 17.

Mother continued to test negative for illicit substances during this review period. She had 18 negative tests between April 2 and September 3, 2025, but she missed tests on August 1 and August 28. Mother explained she failed to test on August 1 because Ace had been placed with new caregivers and she was "overwhelmed and checked out of things." Regarding the August 28 missed test, Mother stated she was sick and "out of it."

Throughout this review period (from April to September 2025), Mother had unmonitored visits with Ace three times per week for three hours each visit. The visits were initially held in the Department's offices but were liberalized to unmonitored visits in the community as of July 28, 2025. The Department continued to report Mother was "extremely attentive" during visits and there were no concerns regarding her interactions with Ace. In July the Department reported that Mother "demonstrated that she shares an extremely strong emotional bond with her son" and had "an understanding of effective parenting and continues to show growth on what skills and knowledge she is obtaining during her parenting classes." Ace was "very connected" to Mother, often clapping and yelling "mama" while waiting for her by the front door of the Department's office.

Mother missed two visits in August 2025. On August 7 Mother cancelled a visit, stating she had been in a car accident the previous day. On August 27 Mother missed another visit, and the social worker confirmed it was due to car trouble. Mother was also significantly late to two visits around August 2025 (35 minutes and 80 minutes).

9

The Department's reports from April until July 2025 contained consistent praise for Mother regarding her parenting and compliance with her case plan. For example, in a July 22 last minute information for the court (in advance of the 18-month permanency review hearing), the Department stated it "applauds mother for her continued resiliency and demonstration of wanting to reunify with her child." However, because Mother "has exhausted the legal time allotted for family reunification services" and the social worker "believes it is premature to recommend that [Ace] return to the care of his mother," the Department recommended termination of reunification services.

In its September 2025 final status report, the Department recommended termination of family reunification services due to Mother's "recent inconsistency and what originally warranted the Department['s] involvement with the family (substance use)." The Department expressed concern "with the amount of time mother has taken to get where she was recently" and her "recent regression and disengagement in programs." The Department stated its belief that it would be premature for Ace to be placed with Mother.

C.   *The Contested 18-month Permanency Review Hearing*

Mother testified at the contested permanency review hearing (§ 366.22) held on September 25, 2025. She stated she had completed more than 52 parenting classes and that the program would continue until Ace turned five years old. She was learning "awareness of [Ace's] mental, emotional, and physical needs and how to attend to them properly," including "noticing evident and subtle cues of what [he] needs, whether it be he's tired, if he's hungry, if he's in emotional distress."

10

Mother testified she had completed approximately 15 anger management classes before being dropped from the program. She missed about three weeks of classes but had already re-enrolled. She was learning from the program "stress management . . . [and] just being able to center myself and not let my emotions dictate my behavior." The lessons allowed her to be "more grounded and a lot more responsive to my son."

Mother acknowledged she had failed to attend anger management classes and therapy sessions in August and failed to appear for two drug tests during that month. She explained she had been in a car accident around that time in which her car was totaled, and she had suffered a "major concussion." In addition, she was also moving and changing jobs and was "in a state of disassociation and derealization" that "made it very hard to manage every single individual thing on top of just trying to take care of myself and my son." On cross-examination Mother admitted she had stopped attending the anger management program approximately two weeks before the car accident because of "misconduct" that occurred in the class. She denied that the provider was unable to get in touch with her during that time. Regarding the two missed drug tests in August, Mother stated she had been sick and had transportation issues.

The Department's attorney asked Mother about her mental health diagnosis. Mother testified that as a teenager she was in a "lockdown facility" and was diagnosed with major depressive disorder, complex post-traumatic stress disorder, anxiety, bipolar disorder, and borderline personality disorder. She was given medication at the time, but she and her psychiatrist agreed that it was not in her "best interest" to continue the medication. She

11

met with a psychiatrist around the time Ace was born, but the psychiatrist did not prescribe any medication.

Mother testified she wanted Ace to return to her custody, stating, "I have fought very hard to be where I'm at today. I have built a life for myself that I never thought I would have, and it came from my son. My son was my motivation for everything I did."

The Department's attorney argued the juvenile court should terminate reunification services stating, "I don't believe that there's enough evidence to show that [Mother] has made enough progress, that she is stable enough to have this child in her care." She cited the fact that Mother was given more than 20 months of reunification services but "has not been able to consistently participate in programming" and has not completed her anger management classes, which was troubling in light of her prior "altercations" with Father and paternal grandmother. Further, Mother had provided differing explanations for her missed drug tests in her statements to the Department and in court.

Ace's counsel agreed with the Department's recommendation to terminate reunification services. She argued Mother "absolutely stopped her progress when she stopped communicating effectively with her programs," and she would be "starting her programs all over again." Further, Mother lacked insight into her situation and had been previously diagnosed with bipolar disorder, which typically requires medication. Ace's counsel noted there was no evidence whether Mother's therapist was aware of this prior diagnosis.

Mother's counsel argued the Department had not met its burden to show returning Ace to Mother's custody would place him at risk of harm. He emphasized that the Department's reports had been "glowing with praise" for Mother's progress and her "brief lapse does not discredit all the progress Mother has been making up to this point." Counsel asked the juvenile court to return Ace to Mother's custody or, in the alternative, to continue reunification services pursuant to section 352.

The juvenile court found return of Ace to Mother's custody would create a substantial risk of detriment to Ace. The court terminated family reunification services for Mother and set the section 366.26 hearing to consider termination of parental rights. The court further found that although Mother had been in substantial compliance with her case plan, that was no longer the case. The court stated it was "very concerned as to the actual [reasons] why [Mother] stopped going to the programs, stopped testing, missed visits. . . . The court does not think that it heard an accurate reason for why that happened. And it concerns me that there was either a relapse, or if not a relapse, . . . the inability to follow through with the programs and the visits. And really everything causes the court to question [Mother's] ability to have taken care of Ace during that time if he were already in her care." The court ordered Mother's visits to revert to unmonitored visits at the Department's offices.

Mother timely filed a notice of intent to file a petition for extraordinary writ, and on October 16, 2025 filed her petition challenging the order terminating services and setting the section 366.26 hearing. On October 22 we issued an order to show cause why relief should not be granted.

**DISCUSSION**

A.      *Governing Law and Standard of Review*

During the reunification stage after a child has been removed from a parent's custody, "the court ordinarily must order child welfare services designed to facilitate the reunification of the family.  [Citations.]  Such services may, depending on the case, include evaluations and assessments, counseling, parent education, substance abuse treatment and testing, and other forms of assistance."  (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624.)  Reunification services ""implement 'the law's strong preference for maintaining the family relationships if at all possible.'"  [Citation.]  This is because 'services enable [parents] to demonstrate parental fitness and so regain custody of their dependent children.'"  (*Ibid*.; accord, *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424 ["Until services are terminated, family reunification is the goal and the parent is entitled to every presumption in favor of returning the child to parental custody."].)

"The Legislature has determined the juvenile court may generally offer family reunification services for a maximum period of 18 months."  (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864 (*Georgeanne G.*); see §§ 361.5, subd. (a)(3), 366.22, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.)  At the 18-month permanency review hearing the juvenile court must order a child returned to a parent's custody unless it finds, by a preponderance of the evidence, that return of the child will create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being.  (§ 366.22, subd. (a)(1); *Georgeanne G.*, at p. 864.)  "That standard is construed as a fairly high one.  [Citation.]  It does not mean the

14

parent in question is less than ideal, did not benefit from reunification services as much as we might have hoped, or seemed less capable than the available foster parent or other family member." (*M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, 660.)  The Department bears the burden of proving detriment.  (§ 366.22, subd. (a)(1); *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.)

In determining detriment, the juvenile court shall consider, among other things, "the social worker's report and recommendations," and "the efforts or progress, or both, demonstrated by the parent . . . and the extent to which they availed themselves of services provided."  (§ 366.22, subd. (a)(1).) The court shall "make appropriate findings" and "specify the factual basis for its decision."  (*Id.*, subd. (a)(1) & (2).)

If the child is not returned to a parent at the permanency review hearing, the juvenile court must terminate reunification services and order a hearing pursuant to section 366.26. (§ 366.22, subd. (a)(3).)  However, the court has discretion to continue the permanency review hearing and the provision of reunification services upon findings of good cause and that the continuance is not "contrary to the interest of the minor."  (§ 352, subd. (a)(1)-(2);[3] see *Michael G. v. Superior Court, supra,*

---

[3]     Section 352, subdivision (a), provides:  "(1). . . [T]he court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor.  In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.  [¶]  (2) Continuances

15

14 Cal.5th at p. 633 ["The power to continue the permanency planning hearing [under section 352] implies a power to continue reunification efforts. Section 352 makes clear that, despite the law's precise timeline for dependency proceedings, the ""Legislature never intended a strict enforcement"" of these statutory limits to "'override all other concerns[,] including preservation of the family when appropriate.'"""]; cf. *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 311-312 ["[w]e do not believe this 18-month limit on family reunification services constrains the juvenile court's authority to order family maintenance services beyond that time for a child who has been returned to the custody of his or her parent"]; *Georgeanne G., supra*, 53 Cal.App.5th at p. 864 [same].)

We review the juvenile court's finding of detriment for substantial evidence by considering whether the evidence, contradicted or uncontradicted, supports the court's finding. (*L.C. v. Superior Court* (2024) 98 Cal.App.5th 1021, 1034; *Georgeanne G., supra*, 53 Cal.App.5th at p. 864.) "We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court." (*Georgeanne G.*, at p. 865; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773.) "However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.'" (*Georgeanne G.*, at p. 865; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1046 [while substantial evidence

shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance."

may consist of inferences, any inferences must rest on the evidence; inferences based on speculation or conjecture cannot support a finding].)

B.  *The Department Failed To Meet Its Burden To Show Return of Ace to Mother Would Create a Substantial Risk of Detriment*

Mother acknowledges she did not comply with her case plan for the first 11 months of the case (December 2023 to November 2024) by failing to enroll in programs and continually testing positive for marijuana.  However, for the 10 months prior to the section 322.26 hearing (December 2024 to September 2025), Mother was substantially compliant with her case plan except for approximately one month during which she stopped attending therapy and anger management classes and missed two visits and two drug tests.

The juvenile court based its detriment finding on a concern that Mother had relapsed or that she had an inability to follow through with her programs and would not have been able to appropriately care for Ace during the month that she ceased complying with her case plan.  None of these inferences was supported by substantial evidence.

Regarding Mother's ability to follow through with her programs and care for Ace, she testified that she had re-enrolled in therapy and anger management classes by the time of the hearing, which the Department verified.  There was no evidence that the approximately one-month gap in programming resulted in any risk to Ace, let alone a substantial risk.  Mother was able to articulate and apply what she had learned from the programs despite her lapse in attendance.  Although Mother failed to

17

attend anger management classes for approximately five weeks, she had already completed 15 classes. Further, the record does not support a finding that Ace was at risk of violence by Mother given that the only violent incident described in the record occurred three years before the permanency review hearing. Mother's discontinuation of therapy for approximately five weeks likewise does not show Ace was at risk of harm. Mother had consistently attended counseling sessions for more than six months, and the therapist noted as recently as June 3, 2025 that Mother was attending sessions regularly and "making significant progress towards treatment goals."

Moreover, despite Mother having been overwhelmed during this period, she continued to have unmonitored visits with Ace, and neither the Department nor Ace's caregivers reported any concerns about her behavior or treatment of Ace. In the absence of any evidence establishing a nexus between Mother's lapse in programming and a risk of harm to Ace, the juvenile court's general concern that there could be a risk was not sufficient to support a detriment finding. (See *Georgeanne G.*, *supra*, 53 Cal.App.5th at p. 869 ["a finding of risk of harm to a child must be based on more than conjecture or a theoretical concern"]; *M.G. v. Superior Court, supra*, 46 Cal.App.5th at pp. 661-662 [substantial evidence did not support detriment finding where the child welfare agency "failed to articulate specific reasons why or how the children would be at risk if placed in Mother's or Father's care" and the court's ruling relied on "vague and nebulous concerns that were not supported by evidence"]; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1343 (*Jennifer A.*) ["Mother was not required to demonstrate perfect

18

compliance" with her case plan in order to avoid termination of parental rights].)

Turning to the two missed drug tests in August 2025, which we treat as positive tests, we agree with the juvenile court that they raise concerns. However, there was no evidence linking any marijuana use on those two occasions to a substantial risk of detriment to Ace. The record does not show at any point in August 2025 (or around that time) that Mother appeared to be under the influence of drugs or exhibited troubling behavior during her visits with Ace. Indeed, when Mother missed the August tests, the Department did not immediately seek to curtail her unmonitored visitation with Ace, instead waiting to raise the missed tests at the next hearing a month later. "The question we face is not whether Mother has an unblemished drug testing record or whether Mother is a perfect parent. Rather, the question is whether substantial evidence supports the juvenile court's finding that returning the children to Mother's custody would create a substantial risk of physical or emotional detriment to the child[]." (*Jennifer A., supra*, 117 Cal.App.4th at pp. 1327-1328.) We examine the missed tests in context and conclude substantial evidence does not support that finding. (*Ibid.*)

During Mother's 11-month period of sobriety, she missed a total of four tests (one in December 2024, one in February 2025, and two in August 2025), and she tested negative 35 times. Although the juvenile court expressed a concern that Mother did not accurately state why she had missed the August 2025 drug tests and instead may have relapsed, it is undisputed that several extenuating circumstances were present at the time, including a serious car accident in which she suffered a

19

concussion, Ace's placement with a new family, Mother's move to new housing, and a conflict with the group leader at her anger management program (which was not serious enough to prevent her from re-enrolling). Although we treat the two missed drug tests as positive tests, there is no evidence that Mother had used any drugs other than marijuana during the approximately two years since the initial referral. And the last time Mother tested positive for marijuana was in October 2024, at which time she showed signs of being drowsy during a visit with Ace. Over the next 11 months leading to the permanency review hearing, there were no signs of Mother being under the influence of drugs around Ace, exhibiting troubling behavior around him, or other concerning conduct that placed him at risk of harm. In this context, Mother's two missed tests, even in combination with the 5-week period in which she was not enrolled in therapy or anger management classes, do not establish substantial evidence of a substantial risk of detriment to Ace. (See *Jennifer A., supra,* 117 Cal.App.4th at pp. 1343, 1345-1346 [Mother's nine missed drug tests, one inability to void during testing, and one positive test during 11-month period did not support finding of detriment and termination of reunification services where all other tests were negative and there was no evidence Mother used substances around the children during that time].)

The Department contends in its opposition to the petition that Mother's mental health issues support the juvenile court's order, arguing that Mother's failure to participate in all of her programming in August 2025 due to being overwhelmed and "suffering from dissociation and derealization" were concerning "for a mother caring for a very young child and not being overseen by a psychiatric and psychological professional."

20

Further, the Department argues, Ace would not be safe with Mother given her "history of mental health issues, which she was not treating with psychotropic medications or overseen by a psychiatrist." We recognize that Mother disclosed her mental health diagnoses at the onset of the case, but the Department did not allege in the petition that Mother's mental health placed Ace at risk of harm, nor did the Department seek to have Mother evaluated by a psychiatrist at any point. Mother's therapist never expressed a concern about Mother's mental health, nor is there any evidence in the record that medication was necessary to treat Mother's mental health issues. Other than Mother's testimony that she was briefly prescribed medication as a teenager, the only reference in the record to medication is Mother's testimony that she met with a psychiatrist around December 2023 (when Ace was born) who did *not* prescribe any medication. Accordingly, the Department's argument that Mother's mental health placed Ace at risk was based on nothing other than speculation. (See *In re A.G.* (2013) 220 Cal.App.4th 675, 684 ["'harm may not be presumed from the mere fact of mental illness of a parent'"]; see also *In re B.H.* (2024) 103 Cal.App.5th 469, 485 ["There must be some connection between the parent's mental health issues and the physical harm or risk of physical harm to the child."].)[4]

---

[4] Because we order the juvenile court to hold another permanency review hearing, we do not address Mother's second argument that the court abused its discretion in reverting visitation to unmonitored within the Department offices. At the new hearing, the court will need to determine whether Ace is returned to Mother, and if not, what visitation is appropriate based on the circumstances at the time.

21

## DISPOSITION

The petition for extraordinary writ is granted.  Let a peremptory writ of mandate issue directing the juvenile court to (1) vacate its order setting a hearing for Ace under section 366.26 and (2) set a continued 18-month permanency review hearing at the earliest date consistent with the rights of the parties to prepare their case.  At a new hearing, in addition to the evidence previously presented, the court is to consider all further evidence of developments subsequent to September 25, 2025 relevant to Ace's safe return to Mother.  In the interest of justice, this decision shall become final as to this court five days from the date it is filed.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)


FEUER, J.

We concur:


MARTINEZ, P. J.


STONE, J.